UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JAMES E. FOX; JOHN H. MAKOWSKY;
and NICHOLAS J. GRISMALE, Individually
and on Behalf of all others similarly situated,

                   Plaintiffs,

         - against -

CHEMINOVA, INC.; CHEMINOVA
AGRO A/S; AGREVO ENVIRONMENTAL
HEALTH, INC.; CLARKE MOSQUITO
CONTROL PRODUCTS, INC;
ZOECON CORPORATION; and
CORPORATIONS "1" THROUGH "5",

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
AND
ORDER

00-CV-5145 (TCP) (ETB)

PLATT, District Judge.

       Defendants Cheminova, Inc. and Cheminova A/S ("Defendant" or
"Cheminova") move against Plaintiffs James E. Fox, John H. Makowsky, Nicholas J.
Crismale on behalf of all others similarly situated ("Plaintiffs") (i) for summary
judgment under Federal Rule of Civil Procedure 56; (ii) to exclude ten (10) of
Plaintiffs' experts pursuant to <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509
U.S. 579 (1993); and (iii) to strike the Plaintiffs' supplemental expert affidavits that
were produced as a response to Defendant's <u>Daubert</u> motion.

       **For the ensuing reasons, all motions are DENIED.**

## <u>BACKGROUND</u>

       As this Court has previously written on a motion to dismiss in this case, <u>see</u>

1

<u>Fox v. Cheminova</u>, 213 F.R.D. 113 (2003), familiarity with the factual background as outlined in that opinion will be presumed. Thus, the Court will only briefly detail the relevant events.

<u>*The Parties*</u>

This lawsuit is brought on behalf of licensed commercial fishermen from New York and Connecticut who were in the business of trapping and selling lobsters in the Long Island Sound ("LI Sound") and who were damaged as a result of the die-off of the lobsters that began in September 1999.

Plaintiffs brought this action against various manufacturers of insecticides (adulticides and larvicides) that were sprayed in and around the New York Metropolitan area beginning in September 1999 to combat the perceived threat of the West Nile Virus ("WNV") outbreak that first appeared in Queens County. Plaintiffs allege that the pesticides caused or contributed to the massive mortalities of lobsters which resulted in a loss of revenue from harvesting and selling lobsters.

Defendant Cheminova is a manufacturer and distributor of a certain pesticide called Fyfanon®ULV ("Fyfanon"), an adulticide containing the active ingredient malathion.[1]

---

[1] The initial action by Plaintiffs included multiple defendants in addition to Cheminova, such as Agrevo Environmental Health, Inc., Clarke Mosquito Control Products, Inc., Zoecon Corporation, and Corporations "1" and "5." Pursuant to settlement, only Cheminova and Zoecon remained in the action. On August 11,

## The West Nile Virus Outbreak and Application of Pesticides

In August and early September 1999, an encephalitis type illness was discovered among several, mostly elderly, people in Queens County, New York City.

Plaintiffs contend that City officials, although not at that stage believing that the situation presented a true emergency, decided to spray the entire city of New York twice with pesticides. Plaintiffs also contend that this plan was developed by Gerald McCarty ("McCarty"), then a member of the Mayor's Office of Emergency Management. Plaintiffs claim that McCarty and his assistants had no experience responding to such a disaster.

Defendant Cheminova, the movant herein, paints a different picture in which, on September 3, 1999, trained experts made an informed decision to administer the pesticides given the state of emergency. The superintendent for the Division of Vector Control in Suffolk County Department of Public Works, his counterpart in Nassau County, and representatives from NYC Department of Health, NYC Mayor's Office of Emergency Management, New York State Department of Environmental Conservation, the Federal Centers for Disease Control and Prevention in Atlanta

2005, Plaintiffs moved–and this Court signed on August 22, 2005–to dismiss Defendant Zoecon with prejudice. Accordingly, only Defendant Cheminova survives in the present action.

("CDC"), and Mayor Rudolph Giuliani all met on September 3, 1999. According to the Defendant, the parties made a unanimous decision to begin application.

What followed was the application (ie. the spraying) of various pesticides in and around the Metropolitan New York area, including Nassau and Suffolk counties on Long Island, all five Boroughs of New York City, Westchester County, and Connecticut. The spraying involved various "adulticides" (products used to kill adult mosquitos that are airborne) and "larvicides" (products used to kill mosquitos still in their larva stage).

Plaintiffs contend that numerous areas were treated along the shoreline of the LI Sound, and in some instances directly over the islands and waters of the LI Sound. Several types of pesticides were applied aerially and by truck and other ground-based methods, and several types were used to treat storm drains and other areas where mosquitos and mosquito larva breed.

In this suit, Plaintiffs contend that the pesticides sprayed in September and October of 1999 caused or contributed to the lobster die-off in Long Island Sound. In addition, the Plaintiffs further allege that the damaging effects of the pesticides on the lobster population were exacerbated by the passing of the Tropical Storm Floyd from September 17-19, 1999, which dumped large amounts of rain and caused a significant runoff of effluent and storm water to enter the Long Island Sound.

Though the case commenced on a design and manufacturing defect theory, it

has now apparently evolved into a failure to warn case with the Plaintiffs alleging that Chemoniva's Fyfanon label in effect in 1999 did not sufficiently warn that the product should not be applied in and around areas where lobsters are commercially harvested. (Pl.'s Opp. Mem. at 16; Def.'s Mem. Sum. J. at 1, n.1)

**Chronology of the Fyfanon Label**

The parties disagree as to the exact chronology of the Fyfanon label. However, it is undisputed that at the time of the spraying in 1999, the Fyfanon label read as follows:

> This product is toxic to fish. Keep out of lakes, streams, ponds, tidal marshes and estuaries. Do not apply where runoff is likely to occur. Do not apply when weather conditions favor drift from areas treated. Do not contaminate water by cleaning of equipment, or disposal of wastes. Shrimp and crab may be killed at application rates recommended on this label. Do not apply where these are important resources. This pesticide is highly toxic to bees exposed to direct treatment or to residues remaining in the treated area. Do not apply when bees are actively visiting the crop, cover crop, or weeds blooming in the treated area. Apply this product only as specified on this label.

It is also undisputed that, at the time of the 1999 spraying, the Defendant had applied for and received EPA approval for an amended (but not yet implemented) label that provided as follows:

> This pesticide is toxic to fish, aquatic invertebrates, and aquatic life stages of amphibians. For terrestrial uses, do

5

not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark. Drift and runoff may be hazardous to aquatic organisms in areas near the application site. Do not contaminate water when disposing of equipment washwaters.

Note for Aquatic Uses: Broadcast use only over intermittently flooded areas. Application may not be made around bodies of water where fish or shellfish are grown and/or harvested commercially.[2]

The parties dispute when the EPA approved this amended label and thus consequently, when the Defendant was required to implement the new label on its product. A corollary issue is also whether, assuming the new label were timely implemented, it would have changed the way the pesticide was applied in this situation. Plaintiffs maintain that the new language should have been included on the Defendant's label as early as 1994. Furthermore, the Plaintiffs maintain that, had the new amended label been "timely" implemented, it would have prevented the spraying which they claim caused the lobsters to die-off. To support this argument, the Plaintiffs mainly point to the language on the amended label: "Application may not be made around bodies of water where fish or shellfish are grown and/or harvested commercially."

---

[2] Federal labeling requirements aside, it would also appear to be an undisputed fact that Defendant knew that the pesticide in question was toxic to and should not be sprayed when shellfish (including lobsters) were grown and/or harvested commercially.

Defendant, however, claims that although they applied to the EPA as early as 1994 to amend the Fyfanon label, the EPA did not officially approve the amendment until 1999. Instead, the Defendant claims that the EPA "accepted with comments" the proposed changes, thus withholding final approval until the comments were implemented. In any event, Defendant argues that a change in the language of the label would not have altered the way that Fyfanon was applied.

**Procedural Background**

On August 25, 2000, Plaintiffs filed a complaint asserting that as a result of the application of the Defendants' pesticides and insecticides to the Greater New York area, the lobsters died-off in the Long Island Sound.

On February 28, 2003, this Court granted class certification status to the Plaintiffs, finding that the requirements of numerosity, commonality, typicality, and adequate representation had been met.

On December 15, 2004, Defendants AgrEvo Environmental Health, Inc.[3] and Clarke Mosquito Products, Inc. settled their cases with Plaintiff, leaving Cheminova and Zoecon Corporation as the remaining Defendants. On November 30, 2004, Defendant Cheminova filed a motion for summary judgment against the Plaintiffs and a motion in limine to exclude the Plaintiffs' experts. Zoecon did not join in the

---

[3] AgrEvo Environmental Health, Inc. was succeeded by Aventis Environmental Science USA and then merged into Bayer CropScience LP.

motions and was dismissed from the action in August of 2005. This Court heard oral

argument on the motions on December 10, 2004 and reserved its decision on them

both.

## **DISCUSSION**

**I.     Motion for Summary Judgment**

Defendant moves for summary judgment on four (4) grounds: (i) Plaintiffs'

claims of mis-labeling are expressly preempted (or at least impliedly preempted) by

the Federal Insecticide, Fungicide & Rodenticide Act, 7 U.S.C. § 136v ("FIFRA");

(ii) Defendant is immune from liability pursuant to the Government Emergency

Doctrine; (iii) there are no material issues of fact as to the Plaintiffs' State law claims

of negligence and public nuisance; and (iv) Plaintiffs have failed to show that

Fyfanon caused the lobster die-off in 1999.

A.     <u>Rule 56 Standard</u>

A motion for summary judgment may not be granted unless the court

determines that there is "no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Anderson

v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). "A party opposing a properly

brought motion for summary judgment bears the burden of going beyond the specific

pleadings, and 'designating specific facts showing there is a genuine issue for trial.'"

<u>Amnesty Am. v. Town of W. Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002) (quoting

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. <u>Chambers v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994).

      B.    <u>Preemption</u>

The preemption doctrine, which is a corollary of the Supremacy Clause, provides that any State or municipal law that conflicts with a federal law is rendered without effect. U.S. CONST. art. VI, cl. 2; <u>Louisiana Pub. Serv. Comm'n v. Fed. Comm. Comm'n</u>, 476 U.S. 355, 368 (1986). A federal law may preempt a State law in one of three ways: (i) expressly by explicitly defining in the regulation the extent to which its enactments preempt State law, (ii) implicitly when Congress has regulated a certain area in a comprehensive fashion, or (iii) when a State regulation conflicts with federal law, thus frustrating the purpose of the federal legislation. <u>Northwest Cent. Pipeline Corp. v. State Corp. Comm. of Kansas</u>, 489 U.S. 493, 509 (1989).

Here, Defendant argues that FIFRA expressly preempts–or in the alternative at least impliedly preempts–Plaintiffs' State law claims of mis-labeling.

      1.    **Express Preemption**

The Defendant argues that FIFRA expressly preempts any State law mislabeling claims because FIFRA itself contains an explicit preemption clause:

> (B) Uniformity
> Such state shall not impose or continue in effect any
> requirements for labeling or packaging *in addition to or
> different* from those required under this subchapter.

7 U.S.C. § 136v(b) (emphasis supplied).  Where, as here, the federal statute contains

an express preemption clause, the Court's task of statutory construction must in the

first instance examine the plain wording of the clause because it provides the best

indicium of Congressional intent.  <u>Sprietsma v. Mercury Marine</u>, 537 U.S. 51, 62-63

(2002).

Defendant argues that the Plaintiffs' State law failure to warn claims are

preempted by FIFRA because the EPA already determined that the Fyfanon label

met the requirements of FIFRA and thus any State law claim that challenges the

sufficiency of the EPA-approved labels is preempted.  Def.'s Mem. Sum. J. at 11-13.

This argument, however, follows a circular logic.  In essence, the Defendant's

argument presumes that its 1999 label was in compliance with FIFRA (and the

EPA's requirements), and that, therefore, any State law misbranding "violation"

would have to be found preempted because it attempts to impose a requirement "in

addition to or different" than FIFRA.

Plaintiffs counter that because the State imposes a duty to maintain a label in

accordance with the federal standards, and FIFRA preempts only State requirements

that are *"in addition to or different"* from it, then no conflict or preemption exists.

The thrust of Plaintiffs' argument explodes the Defendant's presumption that its label was in compliance with FIFRA and the EPA from the outset.

The U.S. Supreme Court has recently determined the scope and breadth of FIFRA preemption in <u>Bates v. Dow Agrosciences, LLC</u>, – U.S. –, 125 S. Ct. 1788 (April 27, 2005). In <u>Bates</u>, a group of Texas peanut farmers alleged that their crops were severely damaged by the application of a newly-marketed weed killer called "Strongarm." They brought claims under FIFRA and the Texas Deceptive Trade Practices Act, State law claims of fraud, breach of warranty, and tort claims sounding in strict liability and negligence. The <u>Bates</u> Court set forth a two-part test as to whether FIFRA preemption applied to particular State law claims: (i) whether the claim was a requirement for "labeling and packaging" and (ii) whether it imposes a labeling and packaging requirement was "in addition to or different from those required" under FIFRA. <u>Bates</u>, 125 S. Ct. at 1798.

In its final analysis, <u>Bates</u> makes crystal clear that FIFRA "preempts any statutory or common law rule that would impose a labeling requirement that diverges from those set out in FIFRA and its implementing regulations. It does not, however, preempt any state rules that are fully consistent with federal requirements." <u>Id.</u> at 1803. Therefore, the fraud and negligent failure to warn claims were preempted to the extent that they added to or differed from FIFRA, a subject on which the Court remanded for further briefing by the parties. The mere fact that those State claims

did "not explicitly incorporate FIFRA's standards as an element of a cause of action" was not dispositive.  Id. at 1800.   On remand, the fraud claim would be preempted if the "element of falsity in Texas' common law definition of fraud imposed a broader obligation than FIFRA's requirement that labels not contain 'false or misleading statements.'"  Id.  The Court made sure to note that while the "state law requirement need not be phrased in the *identical* language as its corresponding FIFRA requirement," it nevertheless must be "genuinely equivalent."  Id. at 1804 (emphasis in original).

In this case, whether the plaintiffs' negligence and public nuisance claims are preempted turns on whether they impose "genuinely equivalent" requirements as FIFRA.  Under FIFRA, a pesticide is "misbranded" if its label contains a statement that is "false or misleading in any particular," including a false or misleading statement concerning the expected results of the pesticide.  § 136(q)(1)(A); 40 C.F.R. § 152.112(f) (2004).   A pesticide is also misbranded if its label does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements.  §§ 136(q)(1)(F), (G).

The Court thus concludes the legal issue that the Plaintiff's State labeling claims are preempted by FIFRA to the extent that they add to or differ from what FIFRA requires.  The parties, however, have not addressed or made a real factual issue of whether the State law labeling claims are "genuinely equivalent" to FIFRA.

To the extent that they do raise this issue, it is only to conclusively state that they are

or are not equivalent.  The parties fail to flesh out the precise contours of the State

labeling laws and thus this Court has no grounds upon which to decide the factual

issue as it is presented in this case.  Thus, summary judgment is denied on the

express preemption claim.

## 2.      **Conflict Preemption**

Even if § 136v(b) of FIFRA does not explicitly preempt the State common

law claims alleged here, Defendant contends that such claims are implicitly

preempted by the doctrine of conflict preemption.  Implied conflict preemption may

exist even where Congress has chosen to include an express preemption clause in a

statute.  Nathan Kimmel, Inc. v. DowElanco, 275 F.3d 1199, 1204 (9th Cir. 2002)

(citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).  Conflict preemption

is found "'where it is impossible to comply with both state and federal requirements,

or where state law stands as an obstacle to the accomplishment and execution of the

full purposes and objectives of Congress.'"  Williamson v. Gen. Dynamics Corp.,

208 F.3d 1144, 1149 (9th Cir. 2000) (citation omitted).  Defendant argues that

allowing the Plaintiffs' State law claims to proceed would conflict with the EPA's

ability to enforce its regulations.   Plaintiffs counter that there is no conflict between

federal and State requirements in this case because the State standards merely echo

the EPA's standards as set forth in FIFRA.

Again, however, a proper conflict preemption analysis in this case would only be feasible if the Court were briefed on the exact contours of the State law claims so that it may compare them with FIFRA. Accordingly, the Court may not decide this issue as well until it has received adequate briefing on the issue.

### 3. **Violation of FIFRA?**

Preemption of State law claims aside, however, the Court nevertheless finds itself stuck in a swampy soup of numerous unanswered factual questions with respect to whether the Defendant violated FIFRA. At bottom, the Court's inquiry is here whether the Fyfanon label was in defiance of FIFRA (and the EPA's) requirements. This determination turns on the timing of the amendment to the Fyfanon label. This Court finds it hard to imagine an issue more rife with material questions of fact as this one, and thus denies the motion for summary judgment on this ground.

The time period within which registrants must amend labels is governed by 40 C.F.R. § 152.130, which provides different time periods based on whether a change is "registrant-driven" (as it is here) or "EPA-driven" (ie, the product is required to be revised as a result of the issuance of a Registration Standard or a notice concluding a special review process). If the amendment is "registrant-driven," the registrant may sell under the previously approved label for a period of eighteen (18) months after approval of the revision, unless an order issued by the

EPA provides otherwise. 40 C.F.R. § 152.130(c).

Plaintiffs claim that the EPA approved the amended label as early as 1994 and thus (regardless of whether "registrant-driven" or "EPA-driven") the Defendant's label was not in compliance with FIFRA when it allowed the spraying of its product in the fall of 1999 with the 1994 EPA–approved label. The Defendant, however, argues that pursuant to 40 C.F.R. § 152.130, the Defendant had 18 months–or until June 2000–to implement the new label. Because the label on the product sold in the fall of 1999 contained the Environmental Hazard language on the March 1994 EPA-approved label (the only one they claim the EPA has approved for use at that time), Plaintiffs state they are entitled to summary judgment on this issue.

Clearly, as evidenced by the parties' 56.1 Statements, the chronology of the label is a question of fact that must be determined by the jury and may not be resolved by this Court at this early stage. See, e.g., Pls.' Counter 56.1 Stmt. ¶ 131; Pls.' Counter 56.1 Stmt. ¶ 132; Def.'s Rep. 56.1 Stmt. ¶ 9; Def.'s Rep. 56.1 Stmt. ¶ 14; Def.'s Rep. 56.1 Stmt. ¶ 18; Def.'s Rep. 56.1 Stmt. ¶ 20; Def.'s Rep. 56.1 Stmt. ¶ 27; Def.'s Rep. 56.1 Stmt. ¶ 41; Def.'s Rep. 56.1 Stmt. ¶ 52; Def.'s Rep. 56.1 Stmt. ¶ 53; and Def.'s Rep. 56.1 Stmt. ¶ 55.

Distilled to its essence, the issue appears to be whether the 18-month clock began on January 9, 1997 or on December 9, 1998. If the clock began on January 9, 1997, as the Plaintiffs claim, then the Defendant had until October 1998 to

implement the amended label.  If, however, the clock started ticking on December 9,

1998, then the Defendant had until June of 2000 to implement the new label, and

thus did not violate FIFRA requirements by continuing to use its 1994 EPA-

approved label in the fall of 1999.

It is undisputed that on January 9, 1997, the EPA "accept[ed] with

comments" Defendant's October 11, 1996 request to amend the label.  Those

comments inform the Defendant that it must include the following language:

> Broadcast use only over intermittently flooded areas.
> Application may not be made around bodies of water
> where fish or shellfish are grown and/or harvested
> commercially.

In addition, the EPA told Defendant to revise its current statement to include:

> This pesticide is toxic to fish, aquatic invertebrates,
> and aquatic life stages of amphibians. For terrestrial
> uses, do not apply directly to water, or to areas where
> surface water is present or to intertidal areas below
> the mean high water mark. Drift and runoff may be
> hazardous to aquatic organisms in areas near the
> application site. Do not contaminate water when
> disposing of equipment washwaters.

The Plaintiffs argue that, based on the EPA's acceptance with comments on January

9, 1997,[4] the Defendant had until October of 1998 to implement the new label.  The

---

[4] The Plaintiffs first argue that November 21, 1994 is when the clock started
ticking for the Defendant because on that date the EPA desired that the Plaintiff
include language regarding aquatic uses.  The Defendant argues, however, that on

16

Defendant, however, argues that January 9, 1997 is not the operative date because it responded to the EPA on June 6, 1998 with another proposed request to amend the Fyfanon label, which differed slightly from the language the EPA approved on January 9, 1997. Thus, according to the Defendant, the FIFRA clock started to tick on December 9, 1998 when the EPA "accepted with comments" the Defendant's June 1998 proposed label.

As there is a material issue of fact as to when the FIFRA clock began to run, summary judgment is denied as to this claim. See, e.g., Pls.' Counter 56.1 Stmt. ¶ 131; Pls.' Counter 56.1 Stmt. ¶ 132; Def.'s Rep. 56.1 Stmt. ¶ 9; Def.'s Rep. 56.1 Stmt. ¶ 14; Def.'s Rep. 56.1 Stmt. ¶ 20; Def.'s Rep. 56.1 Stmt. ¶ 27; Def.'s Rep. 56.1 Stmt. ¶ 41; Def.'s Rep. 56.1 Stmt. ¶ 52; Def'.s Rep. 56.1 Stmt. ¶ 53; and Def.'s Rep. 56.1 Stmt. ¶ 55.

C.    Government Emergency Doctrine

Defendant claims the so-called "government emergency doctrine" shields it from liability from all acts which occurred during the onslaught of the West Nile Virus. Citing to Macias v. California, 897 P.2d 530 (Cal. 1995), the Defendant

---

November 21, 1994, the EPA rejected the Defendant's two proposed labels of June 23, 1994 and October 10, 1994. Merely because the EPA first suggested language regarding aquatic uses in 1994 does not mean that it required the Defendant to change its label as of that date. Accordingly, this Court declines to use November 21, 1994 as the catalyst date for the FIFRA clock.

argues that the West Nile Virus constituted a declared state of emergency for the State of New York, and thus the defendant corporation should be immune from liability during this phase.  In Macias, the State exercised its statutory emergency powers to carry out malathion spraying to eradicate a Mediterranean fruit fly ("Medfly") infestation which threatened the State's agricultural industry.  The Plaintiff in Macias was a child who was blinded as a result of allegedly inadequate warnings of hazard on the pesticide.  The Court held that the Defendant company did not have an independent duty to change the warnings on their label because doing so would undermine the State's emergency response efforts "in times of extreme peril." Id. at 532.

There is no indication in case law or in State statutes that the Second Circuit has even adopted the "government emergency" doctrine.[5]  In fact, New York law only provides for State–and not private parties or corporations–immunity from liability during emergency situations:

*A political subdivision* shall not be liable for any claim

[5] Indeed, the case here does appear to fit the situation presented in Macias, and thus as a policy matter, fails to persuade this Court that the emergency doctrine ought to be extended to this case. In Macias, the Plaintiff argued that the defendant manufacturers, knowing of the State's intended use of malathion and of the inadequacy of public health warnings contained on a flyer distributed by the State, made no attempt to induce the State to modify its warnings that the government provided.  The threat expressed by the Macias court of a private party interfering with the exercise of government sovereignty is not present here.

> based upon the exercise or performance of the failure to
> exercise or perform a discretionary function or duty on
> the part of any officer or employee in [coping with an emergency].

N.Y. Executive Law § 25 (emphasis added). Its failure to extend the protection of

this doctrine to private companies evidences the legislature's intent that they not be

shielded from liability during emergencies. Moreover, the <u>Macias</u> court relied on a

declared state of emergency, whereas here, New York did not declare an official

state of emergency. Thus, summary judgment is denied as to this claim.


D.     <u>State Law Claims</u>

Assuming, *arguendo*, that the Plaintiffs' State law claims are not preempted,

there still remain various genuine issues of material fact which prevent the granting

of summary judgment on these claims. Initially, the Defendant moved for summary

judgment on numerous State law grounds: strict product liability for a manufacturing

or design defect, negligence in designing the product, negligence in the storage of

the product, negligent entrustment of Fyfanon to the government, negligence by way

of fraudulent misrepresentation, "foreseeable misuse," and public nuisance. (Def.'s

Mem. at 27-37) In their opposition, however, the Plaintiffs state that their "claims

against Cheminova lie in its failure to warn. Their claims are based upon negligence

and strict products liability arising from the negligence in failing to warn." (Pls.'

Opp. at 18) Cheminova argues that Plaintiffs have thus abandoned their design and

manufacture defect claims as well as their "foreseeable misuse" claim from their complaint by not specifically addressing them in their opposition papers to this motion.

Because Plaintiffs have failed to address these claims in their opposition papers, the Court may deem them to be abandoned.[6]   However, the Court declines to do so at this juncture because of the following issues of contested fact that remain in the 56.1 statements regarding these claims[7] and the conceded fact that Cheminova knew as early as 1994 that its product was toxic to shellfish.   Where there are, as here, contested issues of fact, the motion for summary judgment is thus denied as to the claims of strict product liability for a manufacturing or design defect, negligence in designing the product, negligence in the storage of the product, negligent

---

[6]   <u>Singleton v. City of Newburgh</u>, 1 F. Supp. 2d 306 (S.D.N.Y. 1998) (holding "[p]laintiff cannot withstand motion for summary judgment by mere reliance on conclusory allegations contained in the complaint;" rather, it must produce evidence to support claim and failure to do so constitutes abandonment); <u>Anti-Monopoly, Inc. v. Hasbro, Inc.</u>, 958 F.Supp. 895, 907 n. 11 (S.D.N.Y. 1997) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"), <u>aff'd</u>, 130 F.3d 1101 (2d Cir. 1997); <u>Ortho Pharmaceutical Corp. v. Cosprophar, Inc.</u>, 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (holding claims of false advertising and deceptive practices dismissed as abandoned because plaintiff failed to argue the claim in its post-trial memo or in its response papers).

[7]   <u>See, e.g.</u>, Pls.' Counter 56.1 Stmt. ¶ 39, Pls.' Counter 56.1 Stmt. ¶ 41, Pls.' Counter 56.1 Stmt. ¶ 46, Pls.' Counter 56.1 Stmt. ¶ 48, Pls.' Counter 56.1 Stmt. ¶ 68, Pls.' Counter 56.1 Stmt. ¶ 74, Pls.' Counter 56.1 Stmt. ¶ 87, Pls.' Counter 56.1 Stmt. ¶ 89, Pls.' Counter 56.1 Stmt. ¶ 90, Pls.' Counter 56.1 Stmt. ¶ 92, and Pls.' Counter 56.1 Stmt. ¶¶ 95-98.

entrustment of Fyfanon to the government, negligence by way of fraudulent

misrepresentation, and "foreseeable misuse."

Accordingly, the Court need only entertain in detail the Defendant's motion

for summary judgment as to the State law claims of negligence, strict products

liability and public nuisance–claims which the Plaintiffs address in their papers.

1.    Negligence and Strict Products Liability

"Where liability is predicated on a failure to warn, New York views

negligence and strict liability claims as equivalent."  Anderson v. Hedstrom Corp.,

76 F. Supp.2d 422, 439 (S.D.N.Y. 1999) (citing Martin v. Hacker, 83 N.Y.2d 1, 8 n.1

(1993) (citation omitted).  To establish a claim for negligence and strict liability

under New York law, the Plaintiffs must show that (a) the Defendant owed a duty to

the Plaintiffs, (b) the Defendant breached that duty, and (c) that the breach of duty

was the proximate cause of the Plaintiffs' injury.  Curley v. AMR Corp., 153 F.3d 5

(2d Cir. 1998).  The standard for evaluating "failure to warn" liability is described by

the Court of Appeals as "intensely fact-specific, including but not limited to such

issues as feasibility and difficulty of issuing warnings in the circumstances;

obviousness of the risk from actual use of the product; knowledge of the particular

product user; and proximate cause."  Liriano v. Hobart Corp., 92 N.Y.2d 232, 243

(1998).  Here, Plaintiffs state that they seek to recover damages from the common

law tort of negligence and strict liability and to use the alleged FIFRA violations as

proof that Cheminova breached its standard of care. (Pls.' Opp. at 4).

Of course, whether the Defendant breached its duty towards the Plaintiffs under FIFRA remains a questions of fact. <u>See</u> discussion <u>supra</u>. Moreover, as detailed below in section E, causation is clearly a genuine issue of material fact that remains to be resolved. In any event, in a duty to warn case such as this one, the generally accepted rule is that the reasonableness <u>vel non</u> of a set of warnings is a question of fact for the jury. <u>Cooley v. Carter-Wallace, Inc.</u>, 478 N.Y.S.2d 375 (4th Dep't 1984). For those reasons, summary judgment should be denied as to these claims.

2. <u>Public Nuisance</u>

As for the Defendant's summary judgment motion on the nuisance claims, it too should be denied. Pollution of public waterways may constitute a public nuisance. <u>Leo v. General Electric Co.</u>, 538 N.Y.S.2d 844 (2d Dep't 1989). In order to establish a defendant's liability for the tort of public nuisance, a plaintiff must prove: (1) the existence of the public nuisance, (2) conduct or omissions by the defendant, and (3) particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of the public nuisance. <u>NAACP v. Acusport</u>, 271 F.Supp.2d 435, 482 (E.D.N.Y. 2003). As with the negligence claim, because causation remains a genuine issue of fact, summary judgment should be denied as to this claim.

E.    <u>Causation</u>

The determination of proximate causation is a matter left for the jury and cannot be resolved by summary adjudication.

> Ultimately, the issue is whether the facts and circumstances presented by the plaintiff in a particular case permit a jury reasonably to infer that a warning, reasonably required, would have been heeded. [A] prediction as to what a worker, alerted to the hazards, would have done is generally within the range of reasonable dispute that makes matters appropriate for submission to a jury.

<u>Rainey v. Owens-Illinois, Inc.</u>, 897 F.2d 94, 96 (2d Cir. 1990). Here, there is no doubt that causation remains a genuine issue of material fact. The four (4) boxes, thousands of documents, and a multitude of experts show that causation of the lobster die-off is clearly a question of fact that has not yet been resolved. <u>See, e.g.,</u> Pls.' Counter 56.1 Stmt. ¶ 167; Pls.' Counter 56.1 Stmt. ¶ 169; Pls.' Counter 56.1 Stmt. ¶ 177; Pls.' Counter 56.1 Stmt. ¶ 179; Pls.' Counter 56.1 Stmt. ¶ 180; and Pls.' Counter 56.1 Stmt. ¶ 135.

For example, other factors, such as water flow,[8] Tropical Storm Floyd[9] and

---

[8] The parties dispute the pattern of water flow in the Long Island Sound. <u>See, e.g.,</u> Defs. Rep. 56.1 Stmt. ¶ 75; Defs. Rep. 56.1 Stmt. ¶ 78; and Defs. Rep. 56.1 Stmt. ¶ 104.

[9] The parties disagree as to the effect of Tropical Storm Floyd. <u>See, e.g.,</u> Defs. Rep. 56.1 Stmt. ¶ 78; Defs. Rep. 56.1 Stmt. ¶ 79; Defs. Rep. 56.1 Stmt. ¶ 80; Defs. Rep. 56.1 Stmt. ¶ 81; Defs. Rep. 56.1 Stmt. ¶ 121; and Defs. Rep. 56.1 Stmt. ¶ 122.

other pesticides[10] have been mentioned as being possibly sole or contributing causes to the lobster die-off in the Long Island Sound. Accordingly, because there remain serious issues of fact as to the causation that are better resolved by a jury, summary judgment is denied.

The Court must also note for the record its doubt as to whether the Defendant's change to the amended label would have thwarted the application of its product over the Long Island Sound in the first instance. Plaintiffs allege that the following language on the EPA-approved Fyfanon label was insufficient to warn of the risks associated with applying pesticides where lobsters are commercially harvested:

> Toxic to Fish...Keep out of lakes, streams, ponds, tidal marshes and estuaries. Do not apply where runoff is likely to occur. Do not apply when weather conditions favor drift from areas treated...Shrimp and crab may be killed at application rates recommended on this label. Do not apply where these are important resources.

Plaintiffs claim that the Fyfanon label should have included the amended language: "application may not be made around bodies of water where fish or shellfish are grown and/or harvested commercially." The Court observes that the difference between the 1994 EPA-approved label and the 1998 EPA-approved label may be a

_____

[10] The parties also disagree as to what extent other pesticides may have been responsible for the lobster die-off. <u>See, e.g.</u>, Defs. Rep. 56.1 Stmt. ¶ 102; and Pls.' 56.1 Stmt. ¶ 13.

distinction without a meaningful difference–both caution against spraying near bodies of water and both versions note that the product is toxic to fish and other aquatic life.

Nevertheless, the many remaining issues of fact as to causation persuade this Court to deny summary judgment.

.        .        .

In sum, as evident above, the following are among the genuine issues of material fact that remain for a jury to resolve, thus precluding summary judgment:

1.  On what date should the amended label have been implemented on Defendant's product?  See, e.g., Pls.' Counter 56.1 Stmt. ¶ 131; Pls.' Counter 56.1 Stmt. ¶ 132; Def.'s Rep. 56.1 Stmt. ¶ 9; Def.'s Rep. 56.1 Stmt. ¶ 14; Def.'s Rep. 56.1 Stmt. ¶ 18; Def.'s Rep. 56.1 Stmt. ¶ 20; Def.'s Rep. 56.1 Stmt. ¶ 27; Def.'s Rep. 56.1 Stmt. ¶ 41; Def.'s Rep. 56.1 Stmt. ¶ 52; Def.'s Rep. 56.1 Stmt. ¶ 53; and Def.'s Rep. 56.1 Stmt. ¶ 55.

2.  Was the Defendant's product sprayed over the Long Island Sound? See, e.g., Pls.' Counter 56.1 Stmt. ¶ 41; Pls.' Counter 56.1 Stmt. ¶ 46; Pls.' Counter 56.1 Stmt. ¶ 68; Pls.' Counter 56.1 Stmt. ¶ 74; Pls.' Counter 56.1 Stmt. ¶ 87; Pls.' Counter 56.1 Stmt. ¶ 89; Pls.' Counter 56.1 Stmt. ¶ 92; and Pls.' Counter 56.1 Stmt. ¶ 90.

3.  Assuming the product was sprayed over the LIS, would the label as amended have prevented the spraying of the Defendant's product over the waters of the Long Island Sound?  See, e.g., Pls.' Counter 56.1 Stmt. ¶ 77.

4.  Whether the spraying of the Defendant's product in August and September of 1999 was the proximate cause to the lobster die-off in the Long Island Sound.  See, e.g., Pls.' Counter 56.1 Stmt. ¶ 167; Pls.' Counter 56.1 Stmt. ¶ 169; Pls.' Counter 56.1 Stmt. ¶ 177; Pls.'

Counter 56.1 Stmt. ¶ 179; Pls.' Counter 56.1 Stmt. ¶ 180; and Pls.' Counter 56.1 Stmt. ¶ 135.

5.    Were other events or products more likely than not the cause of the lobster die-off? <u>See, e.g.</u>, Defs. Rep. 56.1 Stmt. ¶ 75; Defs. Rep. 56.1 Stmt. ¶ 78; Defs. Rep. 56.1 Stmt. ¶ 104; Defs. Rep. 56.1 Stmt. ¶ 78; Defs. Rep. 56.1 Stmt. ¶ 79; Defs. Rep. 56.1 Stmt. ¶ 80; Defs. Rep. 56.1 Stmt. ¶ 81; Defs. Rep. 56.1 Stmt. ¶ 121; Defs. Rep. 56.1 Stmt. ¶ 122; Defs. Rep. 56.1 Stmt. ¶ 102; and Pls.' 56.1 Stmt. ¶ 13.

6.    What effect did the water flow between the East River to the Long Island Sound have on the die-off? <u>See, e.g.</u>, Defs. Rep. 56.1 Stmt. ¶ 75; Defs. Rep. 56.1 Stmt. ¶ 78; and Defs. Rep. 56.1 Stmt. ¶ 104.

7.    Was the water flow in the Long Island Sound such that the surface waters could reach the bottom layers where the lobsters reside? <u>See, e.g.</u>, Defs. Rep. 56.1 Stmt. ¶ 78; Defs. Rep. 56.1 Stmt. ¶ 79; and Defs. Rep. 56.1 Stmt. ¶ 104.

8.    What was the effect of Tropical storm Floyd on the lobster die-off? <u>See, e.g.</u>,  Defs. Rep. 56.1 Stmt. ¶ 78; Defs. Rep. 56.1 Stmt. ¶ 79; Defs. Rep. 56.1 Stmt. ¶ 80; Defs. Rep. 56.1 Stmt. ¶ 81; Defs. Rep. 56.1 Stmt. ¶ 121; and Defs. Rep. 56.1 Stmt. ¶ 122.

9.    What was the effect of other pollutants or pesticides?: <u>See, e.g.</u>, Defs. Rep. 56.1 Stmt. ¶ 102; and Pls.' 56.1 Stmt. ¶ 13.

## II.    <u>Motions Regarding Experts</u>

Defendant moves to exclude ten (10) of Plaintiffs' experts,[11] claiming that

they all fail to meet the criteria set forth in <u>Daubert v. Merrill Dow Pharmaceuticals,</u>

<u>Inc.</u>, 509 U.S. 579 (1993) and its progeny.  Following the oral argument on the

_____

[11] Namely, Robert Bayer, Rodney Bushway, Jeffrey Shields, Lance Stewart, Steve Greenspan, Charles M. Benbrook, James, O'Donnell, Ph.D., Bruce Brownawell, Lila Laux, Ph.D., and Jack V. Matson, Ph.D.

summary judgment motion and the motion in limine, the Defendant filed an addition

motion on January 13, 2005 to strike Plaintiffs' supplemental expert affidavits[12]

under Federal Rules of Evidence 26(c) and 37.

III.    **Daubert Motion**

    A.    Daubert Standard

An evaluation of expert testimony begins with an examination of Federal

Rules of Evidence 104(a) and 702.  Rule 104(a) states in relevant part: "Preliminary

questions concerning the qualification of a person to be a witness...or the

admissibility of evidence shall be determined by the court."  Rule 702 states: "If

scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in

the form of an opinion or otherwise , if (1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and

(3) the witness has applied the principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case. .

In Daubert, the U.S. Supreme Court expanded on these requirements and

---

[12] Specifically, the Defendant seeks to strike the affidavits of Drs. Rodney
Bushway, Robert Bayer, and Jeffrey Shields.

imposed a special "gatekeeping" function on the trial court to ensure that all expert,

scientific testimony is reliable and relevant before being admitted into evidence.

Daubert, 502 U.S. at 595.  In order to fulfill this "gatekeeping" function, the Daubert

court adopted a flexible, two-pronged approach based on Federal Rule of Evidence

702, that requires a trial court to determine (i) whether the reasoning or methodology

underlying the testimony is scientifically valid and (ii) whether the reasoning or

methodology can properly be applied to the facts in issue.  Id. at 293-93.  The first

prong of the Daubert test is a reliability inquiry which involves four (4) factors: (1)

whether a theory or technique can be (or has been ) tested; (2) whether it has been

subjected to peer review and publication; (3) whether in respect to a particular

technique, there is a high known or potential rate of error and whether there are

standards controlling the technique's operation; and (4) whether the theory or

technique enjoys 'general acceptance' within a 'relevant scientific community.'

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-50 (1999) (citing Daubert, 509

U.S. at 592-93)).  The second Daubert prong–the relevance or fit of the expert

testimony–requires the Court to determine whether the expert's opinions "fit the

facts of the case at hand."  Wurtzel v. Starbuck's Coffee Co., 257 F. Supp.2d 520,

525 (E.D.N.Y. 2003).

In order to apply this multi-prong approach to the admissibility of the experts

at issue here, however, the Court must conduct Daubert hearings on each of the

experts. In addition, at this juncture, the Court has no knowledge of who the parties will ultimately call as witnesses at trial. Accordingly, all questions regarding the admissibility of the expert testimony shall be deferred until the Court conducts <u>Daubert</u> hearings.

IV.     **<u>Motion to Strike Expert Affidavits</u>**

Cheminova moves to strike the expert affidavits of Drs. Rodney Bushway, Robert Bayer, and Jeffrey Shields as untimely pursuant to the Federal Rules of Civil Procedure. According to the Defendant, discovery in this case closed on February 3, 2003 and thus these doctors' affidavits–which were enclosed with Plaintiffs' reply memo to Cheminova's <u>Daubert</u> motion, are thus improperly submitted.

However, at this juncture, it is impractical–indeed impossible–for this Court to rule on such a motion until after a <u>Daubert</u> hearing. Accordingly, the motion to strike is denied without prejudice to renew.

<u>CONCLUSION</u>

Accordingly, Cheminova's motion for summary judgment is **DENIED in its entirety**. The motion to exclude Plaintiffs' experts is stayed pending <u>Daubert</u> hearings. Finally, the motion to strike Plaintiffs' expert affidavits is **DENIED** without prejudice to renew pending the completion of the <u>Daubert</u> hearings.

SO ORDERED.

_____/S/_____
Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York
       August 25, 2005